# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**24-654**

**STATE OF LOUISIANA**

**VERSUS**

**ROY JAMES SMITH**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 348,377
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GUY E. BRADBERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Ledricka J. Thierry, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**J. Phillip Terrell, Jr.**
**District Attorney**
**June Wells Foster**
**Assistant District Attorney**
**Ninth Judicial District**
**P.O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR:**
    **State of Louisiana**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**P.O. Box 52988**
**Shreveport, LA 71135-2988**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Roy James Smith**

**BRADBERRY, Judge.**

On September 29, 2020, a Rapides Parish grand jury indicted Defendant, Roy James Smith, with one count of first degree rape, in violation of La.R.S. 14:42(A)(1); one count of carnal knowledge of a juvenile, in violation of La.R.S. 14:80; and one count of indecent behavior with a juvenile, in violation of La.R.S. 14:81. The victim in all counts was C.K., whose date of birth was October 20, 2005.[1] An amended indictment was filed on March 13, 2024, listing only count one and changing it to a violation of La.R.S. 14:42(A)(4), basing the charge purely on the fact C.K. was under the age of thirteen during the alleged offense range of October 20, 2015 to October 19, 2018. A separate amended indictment listed the two remaining charges.

Jury selection occurred on April 9 and April 10, 2024, and trial began on April 11, 2024, solely on the count of first degree rape. That same day, a unanimous jury found Defendant guilty as charged of first degree rape. On April 29, 2024, Defendant was sentenced to the mandatory sentence of life imprisonment at hard labor. At that time, the State dismissed the carnal knowledge of a juvenile charge and the indecent behavior with a juvenile charge.

Defendant now seeks review of his conviction, contending the State's evidence was insufficient to prove that he committed first degree rape. For the reasons that follow, we affirm Defendant's conviction and sentence.

## FACTS

The State's first witness was Lieutenant Andre Clark of the Rapides Parish Sheriff's Office (RPSO), who was dispatched to 1443 Melder Road in Glenmora,

---

[1] The victim's initials have been used to protect her identify in accordance with La.R.S. 46:1844(W).

Louisiana in April 2020 regarding a sexual assault case. Lieutenant Clark, then a patrol deputy, noted the complainant was Earl O'Neal, who advised him that Defendant had been sending inappropriate text messages to his niece, C.K. Lieutenant Clark was told that Defendant had left the area and verified the messages sent to C.K.'s phone. He also noted that he spoke with C.K.'s grandmother, Vivian O'Neal, as well as briefly speaking to C.K., although he noted he did not ask her many questions because it is more appropriate for the Children's Advocacy Center (CAC) to interview juveniles and the detective would be tasked with scheduling such an interview. Lieutenant Clark testified the case was subsequently assigned to Detective Jason Hagan. Aside from obtaining the initial information in the case, Lieutenant Clark testified that he collected the cell phone as evidence, along with sex toys. On cross-examination, Lieutenant Clark clarified that the initial report was made on April 12, 2020.

The State then called Jason Gross, a narcotics agent and SWAT team member for the RPSO. According to Agent Gross, the SWAT team was deployed to the end of Melder Road to search for Defendant. Although he could not recall the exact date, Agent Gross knew the dispatch was a few days after the initial complaint on April 12, 2020. He testified that about ten officers fanned out into a line formation and walked the woods behind the 1443 Melder Road residence but found nothing on the first pass. As they returned to the residence, Agent Gross noticed a neon ribbon tied to a tree; he decided to walk back to the house from the marker and found more markers. Agent Gross then noticed a low pile of brush, which he inspected and found was on top of black mesh; underneath that mesh, Defendant was hiding. He noted Defendant was lying in a shallow hole beneath a mesh tarp. Agent Gross noted Defendant had either one or two backpacks with him, which he believed to be his

2

belongings, although he acknowledged he neither inspected nor seized the bag or bags.

The State then called C.K. C.K. testified that she and her sister Haley were raised by their grandmother, Vivian O'Neal, from the time C.K. was seven. According to C.K., she, Haley, and Ms. O'Neal lived in a home on the property, while C.K.'s uncles, Earl and Jason, both had trailers across a creek from the house. C.K. testified that her Uncle Jason had bipolar schizophrenia. She testified that Defendant moved in with her Uncle Earl after she began living with Ms. O'Neal.

According to C.K., the inappropriate relationship between her and Defendant began when she was around seven years old. She was in a swimming pool, wearing a two-piece bathing suit, and Defendant walked up to her while she was in the pool and stuck his fingers in her vagina. She testified that the pool was an above-ground pool, and Defendant was standing outside of the pool while touching her. C.K. testified that over the next two years or so, Defendant continued touching her vagina and taught her to kiss him and perform oral sex on him. Although she did not remember the type of presents, she recalled Defendant buying her gifts during that time, which would make her happy.

During those years when C.K. was between seven and nine, she testified Defendant would pretend to help her and Haley with their homework; however, he did not actually help. Instead, he would touch her while she tried to do her homework. Once she was about ten years old, it progressed to the point where Defendant would have sex with her multiple times a night. C.K. testified that the first time they had sex, she was ten years old and sitting on the bathroom counter in her grandmother's house. Defendant was standing in front of her, inserted his penis into her vagina, and proceeded to have sex with her. She testified that, at the time,

she did not want him to do that; however, as time went on, he became something "of an obsession" for her.

According to C.K., from the time she was ten beyond the age of twelve, she claimed she and Defendant had sex five or six times a day, every day. C.K. testified that they had sex "[e]verywhere you can imagine between seven acres and two houses." She clarified that included her grandmother's house, both of her uncles' trailers, by the creek, and in the wooded area behind the house. She testified that, in addition to vaginal sexual intercourse, oral sexual intercourse was occurring "[j]ust as often as anything else." She testified this sexual relationship continued past her fourteenth birthday until the complaint was filed against Defendant in April 2020. According to C.K., they continued having sex daily when she was thirteen and fourteen; however, she lost that obsession and wanted to end the relationship because it no longer felt right, and she was interested in boys her own age.

C.K. testified that, towards the end of her relationship with Defendant, he was no longer allowed in her grandmother's house, so he would climb in through her bedroom window, and they would have sex in her bedroom. According to C.K., when she was fourteen, Defendant told her to "pick someone to have a threesome with," and she chose her best friend, Cheyenne. She believed both she and Defendant spoke to Cheyenne about having a threesome. C.K. testified that Defendant took sexual photographs of her and, although she did not remember him taking the video, she recalled watching a video of her performing oral sex on Defendant. According to C.K., she invited Cheyenne to spend the night; however, Cheyenne would not have sex with them. Nonetheless, C.K. testified that she and Defendant had sex in front of Cheyenne in hopes of "her joining at the time."

4

C.K. remembered one occasion when she and Defendant were in her grandmother's kitchen, either beginning or finishing having sex, and her sister Haley came into the kitchen. C.K. recalled being confronted by the school counselor about what was happening at home after a relative, she believed it to be her sister, talked to the counselor about her relationship with Defendant. According to C.K., this was when she was still obsessed with Defendant, and she instead told the counselor that her schizophrenic Uncle Jason was touching her. She claimed that, because of his illness, Jason does not remember her accusing him of anything, despite being told about it, and that he did not get in trouble because she was brought to the Child Advocacy Center for an interview, and she confessed to the interviewer that her uncle never did anything to her.

According to C.K., towards the end of the relationship, there was a false pregnancy scare. She clarified that she knew she was not pregnant, but she told Defendant and other people that she was. C.K. testified that she and Defendant would communicate on her phone, which she was pretty sure Defendant bought and supplied minutes for. Additionally, she testified that Defendant would have her pick out sex toys, which he would order then bring to her for her to use.

According to C.K., the last time she communicated with Defendant, he threatened to kill himself if she did not meet him for sex. She testified that he posted a Facebook Live video of a rope hanging from a tree. It was around this time that her Uncle Earl contacted law enforcement. C.K. testified that, at the time of trial, she was eighteen years old, had a son named Dillon, and was thirty-three weeks pregnant.

On cross-examination, C.K. testified that she and Haley went to live with their grandmother when C.K. was seven because her mother was a drug addict, and her

father had molested her when she was three. She noted that when they moved in with Ms. O'Neal, C.K. was in the second grade, and Haley was in kindergarten. According to C.K., her grandmother refused to buy her a cellphone until she was about thirteen, although her grandmother did not care that she had a phone before then; however, she could not explain why her grandmother was okay with her having a phone that someone else had bought.

Although defense counsel told C.K. that her story was "beyond the realm of possibility," she maintained that she and Defendant were having sex multiple times a day, every day from the time she was ten years old. She claimed she never felt or complained of any kind of discomfort as a result.

The State's next witness was Haley Dubard, C.K.'s younger sister. Ms. Dubard testified that when she was much younger, she and C.K. would try to do homework at the kitchen table in Ms. O'Neal's house, Defendant would be around, and she would "always get sent off to go do something else or [she] just got aggravated and left [C.K. and Defendant.]" Although she did not remember an exact age, she testified it was around the time she was in first or second grade. She testified that Defendant would try to help her with her homework, noting that although it was not very hard for her, it was difficult for Defendant.

According to Ms. Dubard, after Defendant was banned from being at Ms. O'Neal's house, she walked into the kitchen to find Defendant, with his genitals out of his pants, grabbing C.K.'s butt and "humping her physically." On cross-examination, Ms. Dubard testified that she did not recall what year she caught Defendant and C.K. in the kitchen. She believed the incident occurred a few months before Defendant was arrested.

The State then called Cheyenne Allen, C.K.'s childhood friend. According to Ms. Allen, she spent the night with C.K. on one occasion where C.K. and Defendant were inappropriate. She testified that Defendant climbed into C.K.'s bedroom through her window. According to Ms. Allen, they did not ask her to get involved, but Defendant and C.K. had sex under the covers of the bed while she was sitting on the floor next to the bed. Ms. Allen testified that this occurred when she was about fourteen or fifteen. Ms. Allen also testified that Defendant contacted her via text message and sent her videos, noting the conversations involved discussion of sexual acts involving C.K. She testified that her date of birth was in April 2005.

The State's next witness was Detective Curtis Gunter of the RPSO, Criminal Investigations Division. Detective Gunter testified that he is a digital forensics examiner who extracts data from cellphones and computers. Detective Gunter testified that he first became involved in the instant case as part of the crime scene team, photographing C.K.'s bedroom at 1443 Melder Road. Detective Gunter testified that he used an alternative light source to look for biological material but was unsuccessful, noting he was informed "the bedding and clothing had been recently washed."

Moving to Detective Gunter's involvement in the case as a digital forensics examiner, he testified that he received an Alcatel phone belonging to C.K. and two LG phones belonging to Defendant. Detective Gunter noted that one of the phones obtained from Defendant matched a number in C.K.'s phone that had exchanged 219 instant messages with C.K. between March 28, 2020, and April 12, 2020, a span of only fifteen days. He noted that this phone was listed in C.K.'s phone under the contact name "April Renee"; however, C.K. specifically referred to "April" as "Roy James" in one of the messages. From March 31, 2020, to April 12, 2020, there were

7

197 phone calls between the two phones. Detective Gunter identified State's Exhibit 7, a copy of the call logs between C.K.'s phone and one of the phones obtained from Defendant, and he testified that of the 197 calls between Defendant and C.K., the majority were C.K. calling Defendant.

Detective Gunter also identified State's Exhibit 8, a copy of the instant messages between C.K.'s phone and Defendant's phone. Detective Gunter testified that of the two phones obtained from Defendant, they were able to bypass the pass code on the one that C.K. had been texting and calling. He was unable to examine the second phone. He testified that nine photographs of C.K. were found on Defendant's phone, in addition to four videos of C.K. "standing on a basketball goal pole dancing."

Detective Gunter also testified that he found a single picture on the phone of what appeared to be C.K. "with her tongue on the breast of another unknown white female," noting the picture was created on February 29, 2020. He noted that law enforcement could not definitively identify C.K. "but looking at the hair and the other photographs of her it's very similar." He testified that there were also seven photographs taken of "a young blonde haired girl giving oral sex to a male subject." Two of those photographs were sent via text message on February 27, 2020, to a phone number that was confirmed to belong to Cheyenne Allen. Detective Gunter testified that the contact, confirmed to be Cheyenne Allen, was saved as "Ed."

Detective Gunter then identified State's Exhibit 9, a copy of messages sent between Defendant's phone and confirmed a phone number to be Cheyenne Allen's phone. The conversation begins with Defendant asking if the number he is contacting is Cheyenne and identifying himself as "Roy." Detective Gunter noted that the two photographs previously discussed were sent in the conversation with

Ms. Allen after he asked if she was okay with what he and C.K. did. Although not explicitly discussed during trial, we note that the conversation between Defendant and Ms. Allen involved a discussion of C.K. performing oral sex on Defendant, Ms. Allen having previously performed oral sex on C.K., Defendant asking if Ms. Allen could show him how she performed oral sex on C.K., and a request that Ms. Allen either perform oral sex on Defendant with C.K. or let Defendant perform oral sex on Ms. Allen.

The State then called Cainan Baker, the multi-disciplinary team coordinator at the CAC in Alexandria, Louisiana and a fifteen-year veteran of the Rapides Parish Sheriff's Office. According to Mr. Baker, he spent five years as a detective, including two years with the Special Victims Unit of the Rapides Parish Sheriff's Office, prior to going to work for the CAC. Mr. Baker testified that he assisted Detective Hagan on the investigation of Defendant, which began on April 12, 2020. Mr. Baker testified that after he attended the CAC interview of C.K., Detective Hagan obtained a search warrant. Mr. Baker and Detective Gunter then went to Ms. O'Neal's residence to collect evidence from C.K.'s bedroom.

According to Mr. Baker, Defendant was interviewed by Mr. Baker and Detective Hagan after he was apprehended. At the same time, they obtained a search warrant for Defendant's phones. The State then introduced State's Exhibit 6, a recording of Mr. Baker and Detective Hagan interviewing Defendant; however, the State did not publish the entire video to the jury, explicitly stating, "I'd like to play portions of my State's number six, the interview of Roy Smith."

Mr. Baker noted that Defendant repeatedly offered a blanket denial, claiming he did nothing with C.K. and that the reason he was in the woods "was in reference to the suicide [attempt] because he was upset about his family, his ex-wife, and his

9

children. And that any possibility of [C.K.] being pregnant was due to her Uncle Jason." Mr. Baker also noted that Defendant claimed Jason was providing the victim with alcohol. Mr. Baker noted that Defendant continued to maintain throughout his four-hour interview that he never did anything inappropriate with C.K. throughout his four-hour video and instead claimed he was in the woods because he went out there to hang himself. Mr. Baker was unaware of any rope being found in the woods when Defendant was apprehended. According to Mr. Baker, although Defendant claimed he went into the woods on Easter Sunday to kill himself, he admitted sneaking back to Earl O'Neal's house afterwards for food and supplies.

The State then called its final witness, Detective Jason Hagan of the RPSO. Detective Hagan noted that he was a twenty-four-year veteran of the Rapides Parish Sheriff's Office, became a detective in 2018, and had recently been assigned "to Rapides Area Drug Enforcement as a ATF Task Force officer." Detective Hagan was assigned the case on April 12, 2020, when he was dispatched to 1443 Melder Road for a possible criminal sexual complaint. He confirmed that the two phones mentioned by Detective Gunter were recovered from Defendant when he was apprehended.

According to Detective Hagan, Defendant gave them a pattern to unlock his phone during the interview; however, the pattern was incorrect and did not unlock the phone. Detective Hagan also testified that Defendant claimed in his interview that the sex toys found during the investigation were purchased with his bank card because C.K. "had access to his bank card and that she had ordered the, the sex toys herself." The State rested after Detective Hagan's testimony.

**ASSIGNMENT OF ERROR**

In his sole assignment of error, Defendant contends:

10

C.K.'s testimony about her alleged sexual acts with Mr. Smith was incredible, particularly as to the alleged frequency of the acts. The only tangible evidence that tended to corroborate C.K.'s story concerned alleged sexual acts that occurred well after C.K. turned 13. For those reasons, the State failed to prove beyond a reasonable doubt that Mr. Smith was guilty of first degree rape.

Specifically, Defendant contends that all of the evidence against him, aside from C.K.'s testimony, concerned events that happened when C.K. was thirteen or fourteen. He then contends, as he did at trial, that her claims that they were having sex five or six times a day, every day, for years, are just too outlandish to be believed without some corroboration. This court finds this assignment of error lacks merit.

The analysis for insufficient-evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009 (alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of

11

fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

As previously noted, Defendant was convicted of first degree rape in violation of La.R.S. 14:42(A)(4), which defines first degree rape as a rape occurring "[w]hen the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense." In the instant case, the State must prove Defendant raped the victim when she was under the age of thirteen. *See State v. Johnson*, 94-236 (La.App. 4 Cir. 3/16/95), 652 So.2d 1061, *writ denied*, 95-1752 (La. 2/21/97), 688 So.2d 524. Under La.R.S. 14:41(A), rape is defined as "the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." As Defendant was only charged with a single count, the State had to prove that, on one occasion prior to October 20, 2018, Defendant had anal, oral, or vaginal sexual intercourse with C.K.

During her testimony, C.K. stated that prior to the age of ten, Defendant had taught her to perform oral sex on him. She also described, in detail, the first time Defendant had sex with her, in the bathroom of her grandmother's house. C.K. then testified that from the age of ten until the age of fourteen, when the relationship was finally fully discovered and Defendant was arrested, she and Defendant had sex multiple times a day, every day. As noted above, it is the purview of the jury to determine witness credibility, and this court will not disturb that determination unless there are internal contradictions, or the testimony irreconcilably conflicts with physical evidence. Defendant cites no reason to dismiss the jury's credibility determination, aside from the argument presented at trial, that such a high frequency of sexual intercourse would have been highly unlikely.

Simply put, Defendant contends that the story is too outrageous to be true. However, as noted by this court in *F.B.A.*, 983 So.2d 1006, the jury need not believe that Defendant and C.K. were having sex multiple times a day in order to convict Defendant. The jury only had to believe that C.K. had sex with Defendant once prior to her thirteenth birthday in order to convict. Given the testimony from C.K., any rational juror, viewing the evidence in the light most favorable to the prosecution, could have found sufficient evidence that Defendant had sexual intercourse, either oral or vaginal, with C.K. prior to her thirteenth birthday. Accordingly, we find the State's case was more than sufficient to sustain Defendant's conviction. Therefore, this assignment of error lacks merit.

## CONCLUSION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**